UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

Approximately 816,509.99 USDT

Defendant In Rem.

Civ. No. 26-2198

**VERIFIED COMPLAINT WITH
A STATEMENT OF PROBABLE CAUSE FOR A WARRANT FOR ARREST IN REM**

Plaintiff, United States of America, by its attorney, Jeanine Ferris Pirro, United States Attorney for the District of Columbia (by Jafer Aftab, Assistant United States Attorney) brings this Verified Complaint with a Statement of Probable Cause for a Warrant for Arrest In Rem and alleges upon information and belief as follows:

Jurisdiction and Venue

1.     Plaintiff brings this civil action in rem to forfeit and to condemn to the use and benefit of the United States of America the above-captioned cryptocurrency in the amount of approximately 816,509.985971 USDT (hereinafter, the "Defendant Property"), pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 18, United States Code, Section 981(a)(1)(A).

2.     This court has jurisdiction in this matter pursuant to Title 28, United States Code, Sections 1345 and 1355(a), because the United States is the plaintiff in this in rem forfeiture action.

1

3.      Venue lies in this district especially pursuant to Title 28, United States Code, Section 1335(b)(2), because the defendant property is located in a foreign country.

4.      This Court has the authority to issue a Warrant for Arrest In Rem to bring the defendant property into this district pursuant to Title 28, United States Code, Section 1355(d) and Federal Rules of Civil Procedure, Supplemental Rule G(3) on a showing of probable cause. The defendant property is currently subject to the control of a foreign entity.

### Defendant Property

5.      The defendant property is approximately 816,509.985971 USDT, a total sum of funds attributable to the following three virtual currency addresses: 0xb699334ae8b8204eae697ac2a42be77aa12 (hereafter Subject Address 1), 0x132c7518b3f51a1d83f590b091ef58a619ecf459 (hereafter Subject Address 2), and 0x73f590bdaaeaa993a4a1d230517f5b7a06f95b7e (hereafter Subject Address 3), (hereafter collectively the Subject Addresses).

### Statutory Background

6.      Pursuant to 18 U.S.C. §§ 1343 and 1349, 2, and 3, it is a punishable crime to attempt, be complicit, or conspire to devise or intend to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

7.      Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity as defined by 18 U.S.C. § 1956(c)(7) that includes a further listing of specified unlawful activity in

18 U.S.C. § 1961, which includes wire fraud, 18 U.S.C. § 1343, is subject to forfeiture to the United States.

8.      Pursuant to 18 U.S.C. §§ 1956(a)(1)(A)-(B), 1956(c), and 1956(c)(7)(B)(i), 2, and 3, the punishable crimes of money laundering are defined as whoever knowing that property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity or, alternatively, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, or, alternatively, to avoid a transaction reporting requirement under State or Federal law. Specified unlawful activity includes wire fraud as proscribed by 18 U.S.C. § 1343. The term "knowing that property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is a "specified unlawful activity." The term "conducts" includes initiating, concluding, or participating in initiating, or concluding a transaction. The term "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition. A financial transaction shall be considered one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement. The term "financial transaction" also includes a transaction which in any way or degree affects interstate or foreign commerce involving the movement of funds by wire or other means, or involving one or more monetary instruments,

3

or involving the transfer of title to any real property, vehicle, vessel, or aircraft, or a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree. The term monetary instrument includes, among other things, currency of the United States or any other country.

9.      Pursuant to 18 U.S.C. § 1956(a)(2)(A)-(B), 1956(c), and 1956(c)(7)(B)(i), 2, and 3, the punishable crimes of international money laundering are defined as whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represents the proceeds of some form of unlawful activity with the intent to promote the carrying on of specified unlawful activity or, alternatively, knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the source, the ownership, or the control of the proceeds of the specified unlawful activity or, alternatively, to avoid a transaction reporting requirement under State or Federal law. Specified unlawful activity includes wire fraud as proscribed by 18 U.S.C. § 1343.

10.     Pursuant to 18 U.S.C. § 1956(f), there is extraterritorial jurisdiction over the conduct prohibited in this section if the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part of the United States and the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

11.     Pursuant to 18 U.S.C. § 1956(h), the crime of money laundering is further defined as including a conspiracy to commit a violation of 18 U.S.C. § 1956 or 18 U.S.C. § 1957.

12.     Pursuant to 18 U.S.C. § 1957, defines the crime of engaging in a monetary transaction in property derived from specified unlawful activity as whoever knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

13.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of sections 18 U.S.C. §§ 1956 and 1957 or any property traceable to such property is subject to in rem forfeiture to the United States.

Manner and Means of Cryptocurrency Investment Fraud-Money Laundering Schemes

14.     Cryptocurrency investment fraud schemes are often initiated on a marketing effort touting the upside of cryptocurrency volatile investments followed by a false presentation of increased value usually by way of false website exhibits. Once deceived, the victim of the fraud transfers cryptocurrency for the investment. But unbeknownst to the victim, that transfer does not result in the victim's ongoing control of his or her funds as expected in a legitimate brokerage business arrangement. Instead, the investment is transferred instead to the control of the fraud scheme operators without the victim's consent.

15.     Once the fraud scheme operators gain initial control, additional psychological techniques and deceptions are employed to extract more cryptocurrency value from the victims in the form of more investments. This may include claims for taxes owing, claims for funds required to finance reversals, among other deceptions.

16.     Criminals often utilize cryptocurrency to launder funds or transfer proceeds because the cryptocurrency financial system is often anonymous by design and without know-your-customer requirements, there is often no customer service to reverse transactions, and there is no deposit insurance on cryptocurrency funds. The fraud scheme operators simultaneously seek

the advantage of the cryptocurrency platform while preying on the insecurity and anticipated shame of the victim to avoid reporting the loss. In that important timeframe, the fraud scheme operators seek to frustrate efforts to detect their crimes, either by private investigators or law enforcement, by employing money laundering techniques by transferring the cryptocurrency in ways to conceal or disguise the nature, the source, the ownership, or the control of the proceeds of the fraud scheme or further promoting the scheme or without issuing the necessary financial reporting forms.

17.     Generally, it is advantageous for fraud scheme operators to avoid loss of criminal proceeds by avoiding use of United States-regulated banks, because they are required to comply with Know-Your-Customer (KYC) identification and due diligence requirements to detect and avoid financial crime, as required by the Bank Secrecy Act of 1970 (BSA).

18.     In the training and experience of the verifying declarant, the emergence of cryptographic methods of transferring digitized units of value/property is further advantageous for fraud scheme operators because it allows for the transfer of property while avoiding BSA compliance. In particular, a cryptocurrency account does not necessarily have any personal identifying information attributable to it other than a public cryptographic identifier. Furthermore, the use of cryptocurrency is also advantageous because it permits rapid anonymous global computerized transfer of value/property.

19.     In the training and experience of the verifying declarant, fraud scheme operators are utilizing established cryptocurrencies because of the substantial international market participation in these cryptocurrencies as a method of storing a unit of value and ability to exchange or transfer somewhat stable value while avoiding KYC and due diligence requirements.

20. Many cryptocurrencies, including Bitcoin, Ethereum, and Tether, operate via a blockchain, that provides for a recording and verifying process of every transaction ever conducted that is distributed throughout an international computer network. The blockchain will not list the names of parties or beneficiaries to the transaction but will list the date and time of the transaction, the originating and receiving public addresses, and how much cryptocurrency was transferred. The verification process requires certain trusted maintainers of the computer network nodes to independently undertake a joint examination of the blockchain before the transaction is accepted and recorded as a new unique hash code to be recorded on the blockchain to maintain its reliability as immutable. There are different blockchains. Generally, verification and recordation is measured in minutes for valid addresses.

21. In the training and experience of the verifying declarant, fraud scheme operators are engaging in money laundering transfer techniques. Sometimes, preliminary very low value transfers are utilized to test the trustworthiness of the digitized transfer. Ultimately, upon receipt of the remaining substantial value, the operators engage in a sequence of further transfers in a short period of time through numerous cryptocurrency accounts and piecemeal transfers to make detection or tracing difficult. The inference of concealment is present, because further transfers typically incur cryptocurrency costs, known in the industry as gas fees, calculated based on energy, bandwidth, and transaction type, which are in tension with the legitimate business purposes of preserving the legitimate business proceeds, value, and realizing percentage fees. While this presents a financial cost, it provides the advantage of concealing the location, nature, source, ownership, or control to avoid detection and enhance the ability of the fraud scheme operators to continue their criminal enterprises.

22. In the training and experience of the verifying declarant, aside from utilizing pass-through accounts as a method of concealment, fraud scheme operators also utilize a method of transferring across different blockchains to render detection or tracing difficult.

23. In the training and experience of the verifying declarant, fraud scheme operators as well as general market participants seek to avoid overall volatility in the valuation of cryptocurrencies. Given this market demand, certain cryptocurrency system platforms offer a product referred to in the industry as a stablecoin. A stablecoin is a cryptocurrency product pegged to a certain commodity's price, such as gold, or to a more stable fiat currency, such as the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives. Stablecoin products offered by Tether ("USDT") and USD Coin ("USDC") are two popular stablecoins. Both are pegged to the U.S. dollar.

24. In the training and experience of the verifying declarant, and as present in this case, the prevalent investment in stablecoins by the fraud scheme operators exhibits the total deception present at the outset of the fraud scheme, insofar as the fraud scheme operators do not truly believe in the upside of volatile cryptocurrency provided by decentralized finance, but in the certainty of their deception and interest in preserving their criminal proceeds in the stable value of the United States dollar supported by centralized banking finance.

<u>Cryptocurrency Terminology</u>

25. <u>Virtual Currency/Cryptocurrency</u>: Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional

currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

26.    Blockchain:  A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all of their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

27.    Blockchain Analysis: Law enforcement can trace transactions on blockchains to determine which virtual currency addresses are sending and receiving particular virtual currency. This analysis can be invaluable to criminal investigations for many reasons, including that it may enable law enforcement to uncover transactions involving illicit funds and to identify the person(s)

9

behind those transactions. To conduct blockchain analysis, law enforcement officers use reputable, free open-source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain-analysis companies. Through numerous unrelated investigations, law enforcement has found the information associated with these tools to be reliable.

28.     Blockchain Bridge:  A bridge protocol, also known as a cross-chain bridge, is a software application that enables the direct transfer of assets/value across different blockchains (e.g., from the Bitcoin blockchain to the Ethereum network). When a bridge protocol user initiates a transaction from one blockchain to another, the user specifies the number of coins or tokens (i.e., the value) that the user would like to send from the originating blockchain to the destination blockchain.

29.     Virtual Currency/Cryptocurrency Address:  A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

30.     Virtual Currency/Cryptocurrency Exchange: A virtual currency exchange ("VCE"), also called a cryptocurrency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

31.     Virtual Currency/Cryptocurrency Wallet:  A virtual currency wallet (e.g., a

hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

32.    Unhosted Wallet:  An unhosted wallet, also known as a self-hosted, non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (e.g., a virtual currency exchange) to facilitate a transaction involving the wallet. Unhosted wallets allow users to generate and manage their own virtual currency addresses.

33.    Decentralized Exchange: A decentralized exchange (or "DEX") is a peer-to-peer marketplace where users can trade virtual currencies directly with other traders without centralized intermediaries. Users generally retain control over their virtual currency rather than entrusting a central authority to host funds in a centralized or "hosted" wallet. DEXs are operated by self-executing agreements written in code, known as "smart contracts," which automate the trading process. DEXs will algorithmically track the prices of various virtual currencies and often leverage locked reserves of virtual currencies (or other digital assets). These locked reserves are known as "liquidity pools," and they are often used to facilitate trades. DEXs are built on blockchains that support smart contracts, including Ethereum, and often levy fees for their services.

34.    Transaction Fee: A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (e.g., Bitcoin on the Bitcoin blockchain). On the

11

Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Ether ("ETH"), or its fraction, gwei. These fees serve as a form of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

35.    Stablecoins: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, Tether (also known as USDT) is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

36.    Tether: Tether International S.A. de C.V. ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

37.    Ethereum: Ethereum ("ETH") is a cryptocurrency that is open source, public, has a blockchain, and is distributed on a platform that uses "smart contract" technology. The public ledger is the digital trail of the Ethereum blockchain, which allows anyone to track the movement of ETH.

38.    WhatsApp: A Meta platform software application that provides electronic messaging service that allows users to communicate via instant message writings or voice over internet protocol both involving the use of wire or radio transmission affecting interstate or foreign commerce. WhatsApp allows users to engage in peer-to-peer basic message writings, or the creation of group chat writings, or sending of unlimited images, audiovisual media messages, or voice calls. Unlike more limited traditional telephone communication plans, WhatsApp users may communicate with any other user in or around the world.

39.    Importantly, WhatsApp features end-to-end communication encryption that

prevents interception and only permits the other end user to decrypt the communication. In this way, WhatsApp communications or more private than standard short messaging service (SMS) or multimedia messaging service (MMS) communications.

40.    Equally important, a WhatsApp user can choose any country's phone number with any regional exchange regardless of physical residence or location. It is common for cryptocurrency investment fraud operatives to utilize WhatsApp for its capacity for deception and secrecy.

Statement of Probable Cause

41.    In or around November 2025, the Federal Bureau of Investigation (hereafter FBI) identified the Subject Addresses. Pursuant to an FBI review that included corroborative blockchain analysis independent of the commercial records provided, the Subject Addresses contained a significant amount of funds that originated from U.S. based exchanges and were sent in a manner consistent with the typologies and methodology typically used in online cryptocurrency investment fraud-money laundering schemes.

42.    The FBI performed blockchain analysis to trace transactions backwards from the Subject Addresses to the initial fraud proceeds/money laundering placement addresses, or 0-level addresses, that were sourced by victims' addresses hosted at the virtual currency exchanges. Pursuant to a request to the various exchanges, the FBI received and reviewed records kept in the ordinary course of business to identify likely victim account holders.

43.    Based on a review of records from virtual currency exchanges and a review of complaints submitted to the FBI online cybercrime complaint database "IC3," subsequent interviews with identified exchange account holders, and independent review of the blockchains, FBI investigators determined that the Subject Addresses contained fraud victim proceeds. The FBI determined more than 40 victims whose virtual currency funds are contained within the Subject

13

Addresses.

Subject Address 1 - 0xb699334ae8b8204e1854eae697ac2a42be77aa12

44.    Through the analysis of records from Coinbase and corroborative independent blockchain analysis, the FBI identified victim W.H. whose funds were contained in wallet address 0xb699334ae8b8204e1854eae697ac2a42be77aa12 ("Subject Address 1"). In or around February 2026, the FBI interviewed W.H.

45.    In the interview, W.H. stated that he met an online person appearing as "Chin Chin" on a dating website. W.H. later communicated with Chin Chin via WhatsApp. W.H. also spoke on the phone multiple times with Chin Chin as well as through video calls. Chin Chin represented that she lived in Baton Rouge, Louisiana.

46.    W.H. continued that Chin Chin introduced W.H. to a cryptocurrency investment opportunity and directed W.H. to a website and trading platform. However, W.H. could not recall the name of the website. W.H. ultimately invested approximately $400,000 and learned the investment was a scam when W.H. sought a return of his investment funds. Despite W.H.'s instructions for the return of his investment funds, he was denied and deceptively told he owed taxes before any funds could be returned.

47.    Around September 2025, W.H. suffered a stroke, reducing him to a wheelchair and paralyzing his left arm. W.H. currently lives in an assisted living facility. W.H. stated that he believes the scam contributed to his stroke. Despite his instructions for a return of his investment funds, W.H. never recovered any of his funds.

Flow of Funds – W.H.

48.    On or about August 25, 2026, at around 4:22 P.M., W.H. initiated a transaction from his account at Coinbase, a cryptocurrency exchange, that resulted in a transfer of 13.95746916

ETH, spot valued at about $64,144, to 0xe9efb1a91c3d1341b1d47284b665b76755561915 (0xe9). Based on a review of reliable and trustworthy blockchain records, the 0xe9 address has no record of any prior transaction or funds. This lack of prior activity is indicative of the creation of a 0-Level addresses for the preparatory purpose of attempting to complete a cryptocurrency investment fraud scheme.

49.    Approximately 28 minutes after W.H.'s transfer of 13.957452 ETH to address 0xe9, the fraud-money laundering scheme operative transferred the funds to the pass-through address 0xd7d3da75c0133b6d091d5fb92efd1a339f42a03d (0xd7). The prompt pass through conduct is indicative of two distinct money laundering techniques: the first account was created for the placement of fraud proceeds to be passed-through as a money laundering act; the second account is indicative of serving as another layering account demonstrating a distinct money laundering intention.  Seven minutes later, an operative transferred the funds to Tokenlon, a DEX, where the ETH was swapped for 63,321.408244 USDT and returned to 0xd7. The change from a floating virtual currency to a stablecoin simultaneously indicates that the upside floating virtual currency investment marketing pitch was a core and immediate deception of the fraud scheme, because the floating virtual currency was almost immediately converted into a stablecoin, whose value is pegged to the U.S. dollar currency to stabilize and immediately realize the fraud proceeds; and it simultaneously presented yet another money laundering technique of changing the nature of the property to further conceal the fraud proceeds.

50.    Approximately eight minutes later, 63,727.293681 USDT was transferred from 0xd7 to 0x43f3246f1ea7087c4cef62a65d9b8995b85d0e16 (0x43).  Within 0x43, the deposited USDT was commingled with existing USDT funds in 0x43, resulting in a 0x43 USDT balance of

15

167,111.066169 USDT. The pass-through and commingling of funds is indicative of two money laundering intentions to further conceal the nature, ownership, and control of the fraud proceeds.

51.    On or about August 28, 2025, an operative transferred approximately 92,137 USDT to a different address, resulting in a 0x43 USDT balance of 74,974.066169. Pursuant to the lowest intermediate balance rule tracing method, the FBI determined that W.H.'s funds remained in the 0x43 address.

52.    On or about August 29, 2025, an operative transferred 54,943 USDT from 0x43 to address 0xe0f66efefb79e5d4b4b8079768c3a9174017d0b8 (0xe0). Prior to this transfer, 0x43 contained a USDT balance of 0.025011.

53.    Minutes later, an operative transferred 54,943 USDT from address 0xe0 to Subject Address 1. Pursuant to the FBI's tracing analysis, W.H.'s funds remain in Subject Address 1.

54.    A summary exhibit of the financial transaction history of W.H.'s funds is below:



Subject Address 2 - 0x132c7518b3f51a1d83f590b091ef58a619ecf459

55.    Pursuant to a review of reliable and trustworthy records kept in the ordinary course of Coinbase's virtual currency exchange business and corroborative independent FBI blockchain analysis, the FBI identified victim L.S. whose virtual currency funds were traced into wallet address 0x132c7518b3f51a1d83f590b091ef58a619ecf459 ("Subject Address 2"). In or around November 2025, L.S. filed an IC3 complaint with the FBI.

56.     Based on the IC3 complaint filed by L.S., L.S. believed he was investing and trading in cryptocurrency futures with two online platforms: Zeal and Diamond Hill. By reviewing exhibits on the online platform, L.S. observed representations of substantial profits, but neither of the platforms would allow L.S. to withdraw his investments sums or putative profits. L.S. reported losing more than $1 million between the two platforms.

57.     L.S. had believed he was communicating with an online broker named Darden Clark related to the Zeal platform. Darden Clark represented that he worked for Goldman Sachs and guided a group of investors, including L.S., on how to trade daily in cryptocurrency options. Darden Clark also represented to L.S. that Goldman Sachs was using its institutional money to help leverage against the market conditions to drive up the profits.

58.     L.S. had believed he was communicating with an online broker named Chris Bingaman related to the Diamond Hill platform. L.S. was led to believe that he would be able to trade pre-market-opening stock shares through the Diamond Hill platform with institutional account access. L.S. was also led to believe that he would only be able to trade on Chris Bingaman's direct investment choices, including buying into pre-Initial Public Offerings.

Flow of Funds - L.S.

59.     Pursuant to the FBI's review of Coinbase's records and FBI's blockchain analysis, the movement of L.S.'s funds was similar to the mode of operation with W.H.

60.     On or about October 27, 2025, L.S. initiated two transfers from his Coinbase account.  These transactions transferred 30,000 USDC and 20,000 USDC, respectively, to address 0xa51c00c0d2958b0ed432813395ac607852262e37 (0xa5).

61.    Prior to the first transaction, 0xa5 had a preexisting balance of approximately 2,709.791818 USDC. After the verification of L.S.'s first transaction, the balance of 0xa5 increased to 32,709.791818 USDC.

62.    Approximately 42 minutes later, an operative transferred 32,000 USDC from 0xa5 to 0xbe06151d44836f08849f8230792c8c58c5783584 (0xbe), resulting in a balance figure of approximately 709.791818 USDC in address 0xa5, and a balance figure of approximately 110,140.254594 USDC in address 0xbe.

63.    Minutes later, L.S.'s second transfer of 20,000 USDC into 0xa5 occurred, and it remained until about October 30, 2025.  During this period of time, L.S.'s funds were commingled with additional USDC, resulting in a 31,260.471754 USDC balance in address 0xa5.

64.    Shortly afterwards, on or about October 30, 2025, an operative transferred 31,260.471754 USDC from address 0xa5 to address 0xbe.  In the intervening days between the first deposit of L.S.'s 32,000 USDC to 0xbe, no additional USDC was received. An operative conducted two transfers out of address 0xbe resulting in a balance of 32,513.256829 USDC. Pursuant to the lowest intermediate balance rule tracing method, the FBI determined that address 0xbe still contained L.S.'s 32,000 USDC. An operative transferred an additional 31,260.471754 USDC to 0xbe, further commingling those funds with L.S.'s funds, resulting in a 63,773.744489 balance in address 0xbe.

65.    Later the same day, an operative transferred an additional 20,389.257566 USDC from other sources into address 0xbe, further commingling those funds with L.S.'s funds, resulting in a 84,163.002055 USDC balance in address 0xbe.

66.    The following day, on or about October 31, 2025, an operative of address 0xbe utilized UniSwap, a DEX, to swap 70,000 USDC for 70,000 USDT.  Prior to this, 0xbe held a

balance of approximately 44,310.992441 USDT. Following the swap, 0xbe held a balance of approximately 114,313.846769 USDT.

67.    Two minutes later, an operative transferred 110,000 USDT from address 0xbe to Subject Address 2. Pursuant to the lowest intermediate balance rule of tracing, the FBI determined that L.S.'s funds are contained in Subject Address 2.

68.    A summary exhibit of the financial transaction history of L.S.'s funds is below:



Subject Address 3 - 0x73f590bdaaeaa993a4a1d230517f5b7a06f95b7e

69.    Pursuant to a review of reliable and trustworthy records kept in the ordinary course of Kraken's virtual currency exchange business and corroborative FBI blockchain analysis, the FBI identified victim M.S. whose funds were traceable to wallet address 0x73f590bdaaeaa993a4a1d230517f5b7a06f95b7e ("Subject Address 3"). In or around February 2026, the FBI interviewed M.S.

70.    In the interview, M.S. stated that in 2025 he learned of a putative virtual currency online platform called currencys11.com through a WhatsApp group chat. He made what he believed to be investments using a Kraken account, however, Kraken since disabled M.S.'s account.

19

71.    M.S. stated that he was advised by currencys11's putative customer service team to make two transfers totaling approximately $30,000 to a provided virtual currency address on the representation that the funds would be used to finance a cryptocurrency miner who would correct an error related to past transactions initiated by M.S.

72.    M.S. later attempted to withdraw his investment; however, M.S. was advised that he needed to pay more funds for "cross-chain verification" before he could recoup any funds. M.S. has not received any return on his investment or putative fees.

73.    Pursuant to FBI's review of the records and FBI's corroborative blockchain analysis, M.S.'s funds were transferred directly into Subject Address 3.

74.    On or about November 3, 2025, M.S. transferred approximately 4,000 USDT from his Kraken account to Subject Address 3.

75.    The next day, M.S. transferred approximately 26,035 USDT from his Kraken account to Subject Address 3.

76.    Pursuant to FBI's further review of the records, an operative transferred additional funds from other victims into Subject Address 3. On November 19, 2025, approximately two weeks after the account from Tether was frozen, one or more individuals contacted Tether claiming ownership of the funds and inquiring as to why the funds were frozen. Based on my training and experience, these individuals were likely attempting to gather information regarding the freezing of the Tether and/or attempt to convince Tether to release the funds despite the freeze request from the FBI. Tether referred the individuals to certain FBI agents, but the FBI agents did not receive any further contact from the one or more individuals. Based on the coordinated nature of the scheme, it can be inferred reasonably that the additional funds traceable to other victims were

commingled with M.S.'s funds, a money laundering technique designed to conceal the source, ownership, and control of the funds.

77.    A summary exhibit of the financial transaction history of M.S.'s funds is below:



FBI's Ongoing Efforts to Identify Additional Victims

78.    Aside from the three interviewed victims identified above, the FBI identified 12 additional victims through the analysis of records from virtual currency exchanges and corroborated their status of victims through interviews, communications with other law enforcement agencies, review of IC3 complaint submissions, and independent corroborative blockchain analysis.

79.    In or around February 2026, the FBI interviewed victim D.C., who was identified through the analysis of records received from Coinbase. D.C. stated that he learned about a cryptocurrency investment opportunity after meeting an online persona named Oliver Jones on an online dating website. Oliver Jones advised D.C. how to make the putative investment and instructed D.C. to open a Coinbase account. After making a putative investment deposit in June 2025, and a teaser nominal return of funds, D.C. was frustrated from seeking the return of his putative investment funds. D.C. reported an investment fraud loss of approximately $200,000.

80.    The FBI reviewed a complaint submitted via IC3 by victim U.P., who indicated that he was contacted via WhatsApp after befriending an online persona through Facebook. The

persona marketed U.P. on how to make money through contract trading through Crypto.com. After opening an account and making a putative investment in July 2025, and receiving a teaser return of funds, U.P. became suspicious, but was frustrated despite attempts to obtain the return of his putative investments which he reported to be $100,000. The persona advised U.P. that his account was frozen.

81. From a review of virtual currency exchange records and the FBI's corroborative independent blockchain analysis, the FBI has identified at least 40 individuals, including the 15 mentioned above, who are likely victims of CIF schemes whose funds were laundered using at least part of the network of addresses described herein. Of these, the FBI has conducted interviews with four individuals, reviewed IC3 complaints from an additional nine individuals, communicated via email with a foreign victim, and received reliable information from the United States Secret Service ("USSS") regarding an additional victim who reported the scam to the USSS.

82. On information and belief, of the 15 individuals that the FBI has interviewed, reviewed IC3 complaints from, or had other correspondence with, the approximate reported CIF fraud loss is approximately $3,644,418.

83. Below is a table exhibiting the approximate reported loss amounts from these 15 victims whose funds the FBI traced to the Subject Addresses. Additionally, the table provides the current location of the funds traced to each victim.

| Victim | Reported Loss | Subject Address |
|---|---|---|
| W.H. | $ 400,000.00 | SA 1 |
| D.C. | $ 200,000.00 | SA 1 |
| M.S. | $ 30,000.00 | SA 3 |

| | | |
|---|---|---|
| B.B. | $ 4,868.00 | SA 1 |
| C.K. | $ 670,000.00 | SA 1 |
| U.P. | $ 101,000.00 | SA 3 |
| I.S. | $ 31,500.00 | SA 1 |
| J.L. | $ 400,000.00 | SA 2 |
| L.S. | $ 1,153,000.00 | SA 2 |
| M.E. | $ 225,320.00 | SA 3 |
| R.T. | $ 57,090.00 | SA 2 |
| S.P. | $ 26,640.00 | SA 1 |
| J.E. | $ 320,000.00 | SA 1 |
| S.S. | $ 25,000.00 | SA 1 |
| I.P | Not Reported | SA 3 |
| **Total** | $ 3,644,418.00 | |

84. Of the losses reported by the 15 verified victims, the FBI has identified a total of approximately $403,706.8113 in transactions involving the addresses in this scheme. Due to the extensive volume of commingling and transfers in the scheme, only a portion of these funds remain within the Subject Addresses.

85. Of the approximate 40 suspected victims, the FBI has identified a total of approximately $949,541.1782 in transactions involving the addresses in this scheme. Due to the extensive volume of commingling and transfers in the scheme, only a portion of these funds remain within the Subject Addresses.

86. The 40 suspected victims sent funds to approximately 49 different 0-Level addresses, which ultimately had some of their funds transferred to the Subject Addresses. As was the case

with the transfers related to L.M. and D.G., following the transfer from victim exchange accounts to the various 0-Level addresses, the funds were subsequently swapped from ETH or USDC to USDT via a DEX, such as Tokenlon, or Uniswap and sent through a series of one or more of about 37 total consolidation addresses before ultimately being sent through or deposited into one or more of the Subject Addresses. This pattern, thus, demonstrates not just a common scheme, but also a mode of operation in furtherance of the CIF scheme.  Due to the sheer volume and amount of 0-Level and consolidation addresses, an abridged exhibit of the flow of these funds is set forth below for Subject Address 1 followed by another exhibit for the flow of funds for Subject Addresses 2 and 3.





Tether's Control over the Subject Addresses

87. The Subject Addresses are unhosted wallet addresses whose keyholder/user is unknown. On or about November 19, 2025, Tether voluntarily froze the Subject Addresses, which resulted in an internal control to not authorize a validation of a transfer out from the Subject Addresses, coupled with a publication of blacklisting to provide fair notice to the world of the risk of conducting a transfer into the Subject Addresses, effectively freezing the virtual currency attributable to the Subject Addresses while permitted transfers in but with fair warning of the risk associated therewith. At the time of the freeze, the fund balances of the Subject Addresses were as follows:

   a. Subject Address 1: 436,417.457692 USDT

   b. Subject Address 2: 150,000 USDT

   c. Subject Address 3: 133,087.788374 USDT

Following the freeze, Subject Address 1 and 3 received transfers. Subject Address 1 received 88,000.01023 USDT and Subject Address 3 received 9,004.729675 USDT. The receipt of funds after fair warning is indicative of an absence of due diligence and indicative of the scale and recklessness of the CIF fraud scheme.

88. In total, approximately 816,509.985971 USDT remains frozen among the three Subject Addresses.

89. Of the approximately 816,509.985971 USDT held by the three Subject Addresses, at least $734,718 is traceable to one or more of the more than 40 suspected victims identified by the FBI as a result of back tracing, or to additional likely victims that the FBI was not able to identify.

90. Following the freeze, and on information and belief, on or about November 29, 2025, an online persona exhibiting the email address shunlifacai166@gmail.com with an accompanying

bracketed alias "facai" contacted Tether requesting information regarding the freeze of Subject Address 1. On information and belief, Tether provided the persona with contact information for FBI Special Agents. As of the date of this filing, these FBI Special Agents have not been contacted by this persona.

91. Following the freeze, and on information and belief, an online persona exhibiting the email address annarose9852@gmail.com with an accompanying bracketed alias "Jayzhou" contacted Tether requesting information regarding the freeze of Subject Address 3. On information and belief, Tether provided the persona with contact information for certain FBI Special Agents. As of the date of this filing, these FBI Special Agents have not been contacted by this persona.

92. Following the freeze, and on information and belief, an online persona exhibiting the email address gblueowl@gmail.com and accompanying bracketed alias "Jayzhou" contacted Tether requesting information regarding the freeze of Subject Address 3. On information and belief, Tether provided the persona with the contact information for certain FBI Special Agents. As of the date of this filing, these FBI Special Agents have not been contacted by this persona.

**FIRST CLAIM OF FORFEITURE**

93. Pursuant to 18 U.S.C. § 981(a)(1)(C), the defendant property contained in the **SUBJECT VIRTUAL CURRENCY ADDRESSES** constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity as defined by 18 U.S.C. § 1956(c)(7) that includes a further listing of specified unlawful activity in 18 U.S.C. § 1961, that includes wire fraud, 18 U.S.C. § 1343, and is subject to forfeiture to the United States.

## SECOND CLAIM OF FORFEITURE

94. Pursuant to 18 U.S.C. § 981(a)(1)(A), the defendant property contained in the **SUBJECT VIRTUAL CURRENCY ADDRESSES** is involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and 1957, or any property traceable to such property and is subject to forfeiture to the United States.

### CONCLUSION

Wherefore, Plaintiff, the United States of America, requests this Court to issue a Warrant for Arrest In Rem; that upon successful execution of the Warrant for Arrest In Rem, the United States Marshal, or other authorized law enforcement official, obtain the substitute res for the defendant property to effect the in rem jurisdiction of this Court; that due notice be provided to all to appear and show cause why forfeiture should not be decreed; that the res be forfeited and condemned to the United States of America; that the Plaintiff be awarded its costs and disbursements in this action; and such further relief as this Court deems just and proper.

Dated: June 22, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

S/ Jafer Aftab
Jafer Aftab
N.J. Bar 050341997
Assistant United States Attorney
United States Attorney's Office
District of Columbia
(202) 252-6714
Jafer.Aftab@usdoj.gov

29

**VERIFICATION**

I, Jeffrey Pearson, a Special Agent with the Federal Bureau of Investigations, verify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint In Rem and Statement of Probable Cause is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 22nd day of June, 2026

_____
Jeffrey Pearson
Special Agent
Federal Bureau of Investigations